IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

CASE NO.: 5:19-MJ-1941-BO

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | RESPONSE TO APPEAL OF |
| | ) | PRETRIAL DETENTION ORDER |
| MICHAEL ANTHONY GRIFFIN, | ) | [DE 14] |
| | ) | |
| Defendant. | ) | |

The United States of America, by and through the United States Attorney for the Eastern District of North Carolina, hereby responds in opposition to the defendant's appeal of Judge James E. Gates's order detaining the defendant pending trial [DE 12, 14], and states the following:

## I. **INTRODUCTION**

This is a case involving the defendant's multi-year, million dollar, interstate scheme to manufacture, steal, and use more than 100 identifies for profit. As was carefully demonstrated to Judge Gates during more than half of a day of court proceedings, the circumstances of the defendant's offense present not only a severe risk of flight and nonappearance, but also an ongoing risk of economic danger to the community. For reasons that were fully explained by Judge Gates in his oral order of detention [DE 12], as well as other evidence presented by the Government at the detention hearing, the Court should deny the defendant's appeal of the detention order.

## II. PROCEDURAL POSTURE

The defendant is presently detained only upon a criminal complaint charging six offenses. As was demonstrated at the hearing, however, the scope of the defendant's federal crimes spans well beyond those set forth in the complaint. Having only just executed search warrants at the defendant's home and business, the grand jury is still in the process of receiving evidence concerning the defendant's crimes. The Government will, in accordance with law, present charges for consideration by the grand jury within 30 days of the defendant's arrest.

Contrary to defendant's assertions the defendant's crimes, while certainly sophisticated, are not novel. The prosecution is not unique or groundbreaking. Nor is the Government's effort to detain a defendant in an economic crime case. As Judge Gates properly found, where the Government demonstrates by a preponderance of evidence that the defendant is a flight risk, and by clear and convincing evidence that the defendant poses an ongoing economic danger to the community, detention is entirely appropriate and reasonable.

## III. REVIEW OF SECTION 3142 FACTORS

Judge Gates properly considered the Section 3142 factors and announced his consideration of those factors in his oral order finding pretrial detention warranted on both grounds. While the defendant makes various references to the probation office's "recommendation" of conditions of release, the probation office will readily acknowledge that it had no knowledge of the circumstances of the offense, the weight

of the evidence, nor the defendant's family's substantial ties to the fraud, when it drafted its pretrial services report. As such, Judge Gates properly considered the totality of the record, and all of the Section 3142 factors, in ordering pretrial detention in this case.

A. Nature and Circumstances of the Offense

The evidence at the hearing demonstrated that the defendant secretly operated an illicit business whereby he would literally manufacture identities that could be used to withdraw large sums of cash from banks, purchase expensive cars, and otherwise live "under the radar," all without tarnishing one's own reputation and credit. The evidence showed that the defendant not only possessed the technical tools to create identities, such as programs designed to create fraudulent social security cards, driver's licenses, and bank statements. He also possessed the expertise necessary to manipulate the credit reporting system in such a way as to breathe life into newly created, false identities.

The creation of synthetic credit profiles, while not novel, is sophisticated and difficult to detect and investigate. As was demonstrated at the hearing, the offense involves an untraceable application for credit using a social security number, either a stolen number of a minor, or an entirely fictitious number. While the initial application for credit is denied, the denial itself generates a credit profile with reporting agencies, such as Equifax. This new credit profile becomes the synthetic identity that can be used to perpetrate other frauds. After the credit profile has been created, the fraudster then attaches the synthetic identity onto the credit profile of

3

Case 5:19-cr-00346-BO   Document 15   Filed 08/21/19   Page 3 of 14

another individual (either a cooperator or unknowing victim) with good credit. This can be done in a number of ways, including adding the credit profile onto the account as an authorized user. As the credit profile of the host continues to demonstrate a good payment record, the synthetic identity's credit profile becomes "seasoned." Eventually, the fraudster can uncouple the credit profile from the host, and independently use the profile to open lines of credit. The profiles can then be sold off to third parties for fraudulent use, or may be used by the perpetrator to carry out a "bust out" scam. In a bust out scam, the fraudster uses the synthetic identity to purchase an expensive item or items that can be converted to cash. The fraudster then defaults on synthetic identity's debts, leaving merchants holding the bag.

The evidence at the hearing demonstrated that the defendant has the knowledge and expertise to create fictitious identities and to use them to his benefit. In one example, the defendant used an alternative credit profile to obtain a line of credit at a casino. The evidence established the defendant's prolific use of casinos, not only in North Carolina, but also in New Jersey and Nevada. The defendant's cash-based credit washing business (discussed below), provided the defendant with routine influxes of cash. Casinos are routinely used for washing such cash. In another example, the defendant used a synthetic identity to secure financing on an $80K Hyundai Genesis. The defendant also purchased a Maserati in Florida in part using the identity of a Florida man named Michael Griffin, albeit not the defendant's own identity.

While portraying himself to the world as the owner of an entertainment artist promotion company named NARD Holdings, LLC, the defendant in fact used this company as a front to operate his credit and identity fraud business. The evidence established that the defendant marketed himself as being able to repair credit for his customers. In exchange for a fee of between $3,000 and $5,000, the defendant would assist individuals to remove negative tradelines from their credit. The defendant also offered clients, for a substantially higher fee, a synthetic identity that could be used to conduct fraudulent transactions. With respect to credit repair, the defendant conducted the business by fraudulent means. The evidence established that, to cleanse client credit, the defendant would file fraudulent police reports, written in the names of the clients, with the credit reporting agencies. These fraudulent police reports claimed that the clients were the victims of identity theft. In fact, the clients did not file the police reports, and negative tradelines were removed from client credit profiles as a result of the fraud.

The evidence established that, instead of receiving regular business revenue from artist promotion activities, the defendant in fact received more than a million in cash and money order deposits into the accounts for NARD Holdings in connection with the credit repair business. This bank record analysis (which only covered around 3 years of a scheme which in fact spanned at least seven years from 2012 to 2019), showed that the defendant routinely received deposits of $3K and $5K into the NARD Holdings accounts, consistent with the credit repair fraud and verified deposits from the credit repair business. The investigation has established that these

accounts are not the only bank accounts utilized by the defendant to carry out the scheme and, as such, untold additional accounts and capital may have been amassed by the defendant. The agent testified that the Government is presently unable to account for the more than $1 Million received into the NARD Holdings accounts, although as noted, the defendant made various deposits of cash into casinos. In other words, more than a million in cash remains at large and available to facilitate an escape.

Despite the defendant's receipt of more than $1 Million from the business, the defendant declared none of this money on his taxes. In fact, since 2012, which is the earliest known offense conduct, the defendant has made no tax filings with the IRS.

The evidence at the hearing established that in addition to the defendant's frequent interstate travel to visit casinos, the defendant's clients (more than 100) came from all over the country. The clients remain the subject of investigation and all remain at large.

Of particular to concern to Judge Gates, as indicated in his oral order, was the fact that the defendant continued to perpetrate the offense even after being confronted with the offense by law enforcement. The evidence showed that in 2014, the Knightdale Police Department was contacted by Equifax with the complaint that Equifax had received as many as 50 police reports, in the names of various individuals, claiming that they were the victim of identity theft. Through their investigation, Equifax and the Knightdale Police Department traced these reports to the defendant. When the Knightdale police contacted the defendant, he would not

6

directly explain how he conducted his business, but alluded to writing letters to the credit bureaus. At that time, the defendant stated he was operating the business from his home, and that the business was named Unlimited, Inc. In fact, there was no such business named Unlimited, Inc. Griffin denied any knowledge of fraudulent police reports, and directed all further inquiries to an attorney, whose contact information he would not provide.

Evidence at the hearing established that the more than $1 Million in receipts discussed above, occurred *after* this encounter with law enforcement in 2014 in which the fraudulent police reports were discussed. Moreover, evidence established the defendant's ongoing operation of the fraud, and his ongoing use of synthetic identities, even up to 2019. Agents continue to examine the voluminous records and 11 electronic items of evidence recovered the searches executed at the time of the defendant's arrest. While the Government has a warrant for the search of the defendant's phone, the defendant has refused to provide a passcode, which has further hampered law enforcement's efforts to secure the most up to date evidence of the defendant's fraudulent activities.

The circumstances of the offense also reflected the defendant's family's extensive ties to the credit washing and synthetic identity fraud. The evidence gathered by the time of the hearing established that as many as 7 different family members living in the area are directly tied to the fraud. These ties included the discovery of credit repair documents, false identification documents, false paystubs, and police reports, in the names of various family members. Members with

documents tied to the scheme included the defendant's wife, as well as various sisters and brothers.

## B. Weight of the Evidence

As Judge Gates properly found, the Government presented "more than enough" evidence to achieve a conviction in this case. With respect to the charges in the criminal complaint alone, the evidence established that the named clients admittedly went to the defendant seeking credit repair services. They paid the defendant for the services as described, and funds flowed into the defendant's accounts. The evidence established that the defendant did not tell the clients that a fraudulent police report would be filed in their name. Nevertheless, the evidence further showed that for each of the fraudulent police reports filed with the credit reporting agencies in the names of the clients, the police reports were in fact fictitious. No such reports existed with the law enforcement agencies identified. The evidence further established that the fraudulent credit repair documents were faxed from the defendant's business. Although over time the defendant learned to shroud the conduct through the use of changing VOIP fax identifiers, these fax numbers were nevertheless traced to the defendant through internet protocol address analysis.

As if this evidence was not enough, the Government also reported to the court the preliminary results of the searches of the defendant's house, business, and car. These search results conclusively established that the defendant was running the fraudulent credit repair business as described. He possessed credit repair files by client, including correspondence, fraudulent police reports, social security cards, and

driver's licenses for the clients. The defendant also utilized email accounts in his name to correspond with clients.

Lastly, the Government presented evidence that the defendant possessed the tools necessary to not only wash credit, but also assume the identity of a fictitious and synthetic identity for the purposes of carrying out fraud. The Government found program templates for generating driver's licenses, social security cards, and bank statements. In other words, using these programs, the defendant could create fraudulent identification documents in the name of anyone he wanted, using a real and usable synthetic credit profile. Knowledge of how to utilize these applications to perpetrate fraud opens the door for the defendant to untold sources of untraceable capital. Fraudulent documents created using these tools include, but are not limited to, fake driver licenses for the defendant and his wife, as well as fake social security cards.

In sum, Judge Gates made no mistake in finding that there is more than enough evidence to convict the defendant on the charges in this case.

### C. History and Characteristics

As Judge Gates properly found, the defendant's history and characteristics also do not conclusively support release in this case. With respect to criminal history and appearance record, although the defendant does not possess a lengthy record of felonies, he has amassed a number of convictions indicative of a character and predisposition toward fraud and failure to appear. These convictions include Special Identity Fraud and multiple worthless check convictions. The defendant has also

amassed various other arrests for such conduct, which were either resolved by settlement or dismissed. Although the defendant wrongly attempts to whitewash all of his prior misdeeds as "mere traffic offenses", the pretrial services report reflects a "failure to appear" not less than SEVEN offenses. As Judge Gates notes, flight risk is not limited to the risk that someone will flee to a foreign country, but rather whether they can be entrusted to appear as directed. The record before the court establishes that the defendant has not earned any such trust through his criminal history or appearance record.

The defendant's family ties are also of no moment. As noted above, many of the defendant's family members are fact witnesses at best, and potential accomplices at worst. Of note, the defendant attempted to present sister Katina Perry as a third party custodian at the detention hearing. Ms. Perry testified to having no knowledge of what the defendant did for a living, but further testified that she herself has had no business dealings with the defendant. In fact, the evidence showed that, along with the defendant's other client files in his Maserati, he possessed not only a copy of Ms. Perry's genuine W-2, but also two paystubs reflecting that Perry worked for NARD Holdings LLC. Finally, the evidence established that the homes of family members were used to carry out the fraud, as well as various post office boxes. In sum, the defendant's family ties do not aid his argument for release.

The defendant's employment and financial resources also point toward detention rather than release. While the defendant tells the Probation office that he has negative cash flow and a net worth of $37K, the evidence established that the

defendant has received in excess of a million dollars, none of which was reported to the IRS. These assets are at large and potentially available to aid in a release. Likewise, the defendant does not own the house and cars that he lists as assets. The residence is in fact his wife's, and the valuable vehicles he owns (including the Maserati) are encumbered to the full extent of their value. Finally, the evidence has established that the defendant's outward business, NARD Holdings, is largely a front with no significant revenue. In sum, nothing about the defendant's financial or employment situation supports release.

D. Nature and Seriousness of the Danger Posed by Release

As found by Judge Gates, clear and convincing evidence established that the defendant poses an ongoing danger to the community and flight risk. The evidence showed that even after being confronted by police early in the scheme in 2014, the defendant continued to carry out the scheme to the tune of more than $1 Million in additional fraud revenue which is now untraceable. Moreover, the evidence showed that the defendant enhanced his efforts to conceal his involvement in the scheme following contact by law enforcement by cloaking his fax transmissions using VOIP generated fax numbers, which disguise the identity of the person transmitting the messages to the credit agencies. Additionally, the evidence established that even after being contacted by law enforcement, the defendant himself, using a synthetic credit profile purchased an $80K vehicle.

In sum, the ongoing economic danger posed by the defendant is directly linked to his knowledge of how to shroud his conduct in the identities of others and conduct

his business anonymously. The defendant has previously conducted the fraud from his home, and has shown a propensity to do so even the face of potential criminal penalties. As found by Judge Gates, no condition or combination of conditions can reasonably ensure the protection of the public from the defendant's crimes, when he can simply continue to conduct them from his home. Electronic monitoring, and a family member/fact witness third party custodian are useless when it comes to mitigating the risks posed by the defendant.

Finally, it should be noted that the defendant faces significant criminal penalties if convicted in this case. Until now, the full scope of these potential penalties have been unknown to the defendant. The Government projects, taking into account appropriate Guideline enhancements and statutory minimums, that the defendant faces a sentence of near ten years in prison if convicted. Judge Gates properly found that this fact alone creates a every strong incentive to flee, let alone the defendant's apparent access to untold amounts of capital, a million in fraud proceeds, the ability to assume the identity of whoever he chooses to, and a propensity toward non-appearance.

## IV. <u>CONCLUSION</u>

In sum, Judge Gates did not err in finding that the defendant poses a risk of flight and ongoing economic danger to the community, warranting detention pending trial. The Government respectfully requests that the court review the official recording of the detention hearing before Judge Gates, as this recording will reflect the Court's careful consideration of not only those arguments presented by the

12
Case 5:19-cr-00346-BO Document 15 Filed 08/21/19 Page 12 of 14

Government in this response, but also those arguments presented by the defendant in his appeal. For all of these reasons, the Government respectfully requests that this Court deny the defendant's appeal of the detention order without further hearing.

Respectfully submitted, this the 21st day of August, 2019.

        ROBERT J. HIGDON, JR.
        United States Attorney

BY:   /s/ William M. Gilmore
       WILLIAM M. GILMORE
       Assistant United States Attorney
       Criminal Division
       150 Fayetteville Street, Suite 2100
       Raleigh, NC 27601
       Telephone (919) 856-4338
       Email: william.gilmore@usdoj.gov
       N.C. State Bar No. 47037

CERTIFICATE OF SERVICE

This is to certify that I have this 21st day of August, 2019, served a copy of the foregoing Government's Response upon the defendant by CM/ECF as follows:

J. Brad Polk
Attorney for Defendant
N.C. State Bar # 36998
bpolk@tarltonpolk.com
P. O. Box 1386
150 Fayetteville St, Ste 930
Raleigh, NC 27601
919-984-6464 (TEL)

Raymond C. Tarlton
Attorney for Defendant
N.C. State Bar # 38784
rtarlton@tarltonpolk.com
P. O. Box 1386
150 Fayetteville St, Ste 930
Raleigh, NC 27601
919-984-6464 (TEL)

William C. Pruden
Attorney for Defendant
N.C. State Bar #52690
wpruden@tarltonpolk.com
P. O. Box 1386
150 Fayetteville St, Ste 930
Raleigh, NC 27601
919-984-6464 (TEL)

BY: /s/ William M. Gilmore
WILLIAM M. GILMORE
Assistant United States Attorney
Criminal Division
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601
Telephone (919) 856-4338
Email: william.gilmore@usdoj.gov
N.C. State Bar No. 47037