WMG

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:19-CR-346-1BO(4)

FILED IN OPEN COURT
ON 8/22/19 STS
Peter A. Moore, Jr., Clerk
US District Court
Eastern District of NC

UNITED STATES OF AMERICA )
)
v. ) INDICTMENT
)
MICHAEL ANTHONY GRIFFIN, SR. )

The Grand Jury charges that:

## BACKGROUND

1. MICHAEL ANTHONY GRIFFIN, SR. was an individual who resided and did business in the Eastern District of North Carolina. Operating from his home in Knightdale, and from a business location in Raleigh, Griffin accepted fees from clients for alleged credit repair services. In reality, Griffin was creating fictitious credit profiles and fraudulently altering client credit data through the use of fictitious police reports.

2. The Credit Repair Organizations Act (CROA) defines a credit repair organization (CRO), in part, as any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) and service, in return for the payment of money or other valuable consideration, for the express or implied purpose of:

1

a) Improving any consumer's credit record, credit history or credit rating, or

b) Providing advice or assistance to any consumer with regard to any activity described in (a).

3. Equifax is a Consumer Reporting Agency (CRA) which is in the business of assembling and evaluating consumer credit information and other information regarding consumers for the purpose of providing reports about the credit-worthiness of consumers to third parties. This information is commonly referred to as a credit report.

4. CRAs typically sell credit reports, directly and indirectly, to, among others, entities in the business of making decisions regarding whether, and on what terms, to lend money to consumers or to sell goods and services to consumers on credit (the "end-users"). CRAs may also provide end-users with "credit scores."

5. Credit scoring is a statistical methodology that quantifies credit risk posed by a prospective or current borrower and is based on information in the credit report. Credit scoring is widely used to evaluate applications for credit, identify prospective borrowers, and manage existing credit accounts. The ultimate credit score of a particular customer is influenced by many factors, including the consumer's payment history, utilization of credit, balances, available credit limit, and length of credit history.

6. End-users of credit reports and credit scores use them to determine creditworthiness of their customers. Common end-users of credit reports and credit scores are credit card issuers, mortgage lenders, and automobile lenders.

7. Credit histories are comprised of information provided to CRAs by, among other sources, "furnishers." Furnishers are entities that provide information relating to consumers to one or more CRAs for inclusion by the CRA in a credit report and, ultimately, for the information to be factored into a credit score. Common furnishers are credit card issuers, automobile lenders, department stores, utilities, insurers, and collection agencies.

8. Many furnishers are also end-users of credit reports. Because of the importance of credit histories and credit scores to lending decisions, the integrity and availability of accurate data and information maintained by CRAs is extremely important to furnishers, end-users, and CRAs.

9. A line of credit is an agreement between a lender and a consumer whereby the lender agrees to lend a consumer funds up to an agreed upon limit. The consumer may borrow as much of the line as needed and pays interest on the borrowed portion only. Payment amounts are typically based upon the outstanding balance amount.

10. Lines of credit or credit accounts are the most common item appearing on a credit report. CRAs commonly refer to these as tradelines. Each tradeline listed on a credit reports contains detailed information about the account.

3

11. According to Section 611 of the Fair Credit Reporting Act (FCRA): "...if the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly, or indirectly through a reseller, of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file in accordance with paragraph (5), before the end of the 30-day period beginning on the date on which the agency receives the notice of the dispute from the consumer or reseller."

12. Furthermore, Section 605B of the FCRA states: "Except as otherwise provided in this section, a consumer reporting agency shall block the information in the file of a consumer that the consumer identifies as information that resulted from an alleged identity theft, not later than four (4) business days after the date of receipt by such agency of:

a) Appropriate proof of identity of the consumer;

b) A copy of an identity theft report;

c) The identification of such information by the consumer; and Statement by the consumer that the information is not information relating to any transaction by the consumer."

4

## COUNTS 1 - 3

### THE SCHEME

13. Beginning at a time unknown, but no later than November of 2012, and continuing to a time unknown, but no earlier than July of 2019, within the Eastern District of North Carolina and elsewhere, the defendant, MICHAEL ANTHONY GRIFFIN, SR., devised and intended to devise a scheme to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises.

### MANNER AND MEANS

14. Introductory Paragraphs 1 through 12 are realleged and incorporated by reference into Counts One through Three.

15. Griffin operated a fraudulent CRO which served to defraud credit bureaus, merchants who utilize credit information provided by credit bureaus, and Griffin's own clients.

16. To carry out the scheme, Griffin informed potential clients that he could boost their credit scores, or provide them with an alternative credit profile number (CPN) to conduct credit transactions. Griffin charged a fee of several thousand dollars for these services. Griffin accepted payment for his services in cash, via check and via money order.

17. Griffin filed fraudulent disputes with the CRAs, alleging that a particular negative trade line on the client's credit report was the result of the theft

of the client's identity. To convince the credit reporting agencies that his clients' identities had been compromised, Griffin drafted and caused to be drafted false police reports which purported to reflect that the client had contacted the police to report the loss or theft of their identity. Griffin then transmitted and caused to be transmitted the false dispute paperwork, including the fraudulent police reports, to CRAs via United States Mail or interstate fax transmissions.

18. In fact, however, Griffin's clients did not have their identity stolen, and did not file the police reports that Griffin sent to the CRAs. In reality, the police reports were fabricated and the clients were not fully informed of the fraudulent means by which Griffin was repairing their credit.

19. The CRAs received and relied upon the fraudulent dispute paperwork created and transmitted by Griffin, resulting in the removal of negative tradelines on the client credit profiles.

20. In some instances, Griffin also offered clients, in exchange for money, the opportunity to utilize an alternative credit profile to conduct credit transactions. In reality, the credit profiles were fraudulently created by Griffin so that Griffin and others could engage in credit transactions without utilizing their true identity and revealing their true credit history.

## USE OF THE WIRES

21. On or about each of the dates set forth below, in the Eastern District of North Carolina and elsewhere, the defendant, MICHAEL ANTHONY GRIFFIN, SR.,

6

for the purpose of executing the scheme described above, and attempting to do so, willfully caused to be transmitted by means of wire communication in interstate commerce the signals and sounds described below for each count:

| COUNT | DATE | WIRE |
|---|---|---|
| 1 | 2/21st/2017 | Interstate wire transmission of from North Carolina to Equifax in Atlanta, Georgia, containing fraudulent Raleigh Police Department Report P17-005942 claiming that K.B. was the victim of identity theft. |
| 2 | 5/25/2017 | Interstate wire transmission of from North Carolina to Equifax in Atlanta, Georgia, containing fraudulent Wilson Police Department Report P17-345614 claiming that T.D. was the victim of identity theft. |
| 3 | 6/15/2017 | Interstate wire transmission of from North Carolina to Equifax in Atlanta, Georgia, containing fraudulent Raleigh Police Department Report P17-005942 claiming that K.L. was the victim of identity theft. |

Each entry in the foregoing table constituting a separate violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT 4

22. Paragraphs 1 through 21 are realleged and incorporated by reference into this Count.

23. On or about May 25, 2017, in the Eastern District of North Carolina, the defendant, MICHAEL ANTHONY GRIFFIN, SR., aiding and abetting another, did knowingly use, without lawful authority, a means of identification of another person, to wit, the name, address, and date of birth of T.D., during and in relation to a felony violation enumerated in 18 U.S.C. § 1028A(c), to wit, Wire Fraud, in violation of Title 18, United States Code, Section 1343, knowing that the means of identification

7

belonged to another actual person, in violation of Title 18, United States Code, Sections 1028A(a)(1) and 2.

## COUNT 5

24. Paragraphs 1 through 20 are realleged and incorporated into this Count.

25. Between in or about October 23, 2017 and November 6, 2017, in the Eastern District of North Carolina, MICHAEL ANTHONY GRIFFIN, SR. contacted Johnson Automotive, also known as Johnson Hyundai of Cary, for the purpose of purchasing a 2018 Hyundai Genesis, Model G90 (the "Genesis"). The sales price for the Genesis was $72,725.00.

26. During the course of applying for financing on the Genesis, the defendant was required to provide various background and demographic information about himself, including a copy of his social security number for the purpose of checking the defendant's credit.

27. Rather than supplying his own social security number, the defendant provided a social security number belonging to another individual. In furtherance of the transaction, the defendant also presented the dealer a fraudulent social security card. The social security card was fraudulent because it contained the defendant's name, but the social security number belonging to another individual.

28. Therefore, between or about October 23, 2017 and November 6, 2017 in the Eastern District of North Carolina, the defendant MICHAEL ANTHONY GRIFFIN, SR., knowingly and with intent to defraud, produced and used a

8

counterfeit access device, to wit, the production and use of a fraudulent Social Security card bearing a number ending in 9281, said production and use affecting interstate and foreign commerce, through the interstate verification of credit by CRAs, all in violation of 18 U.S.C. §§ 1029(a)(1) and (c)(1)(a)(i).

## FORFEITURE NOTICE

The defendant is given notice of the provisions of Title 18, United States Code, Sections 982(a)(1) and 981(a)(1)(C) (the latter as made applicable by Title 18, United States Code, Section 2461(c)), that all the defendant's interest in the property specified herein is subject to forfeiture.

As a result of the foregoing offenses in Counts 1 through 5 of the indictment, the defendant shall forfeit to the United States any and all property, real or personal, constituting, or derived from, any proceeds the defendant obtained directly or indirectly as a result of the said offenses and, in respect to Counts 1 through 5, any property, real or personal, involved in such offenses, or any property traceable to such property.

The forfeitable property includes, but is not limited to the gross proceeds of the offenses in Counts 1 through 5 that were received by the defendant.

If any of the above-described forfeitable property, as a result of any act or omission of the defendants --

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred or sold to, or deposited with, a

9

third person;

(3) has been placed beyond the jurisdiction of the court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which cannot be subdivided without difficulty --

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) (made applicable by Title 18, United States Code, Sections 982(b)(1) or Title 28, United States Code, Section 2461(c)), to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property.

A TRUE BILL

REDACTED VERSION
Pursuant to the E-Government Act and the federal rules, the unredacted version of this document has been filed under seal.

FOREPERSON

DATE: 8/22/19

ROBERT J. HIGDON, JR.
United States Attorney

BY: WILLIAM M. GILMORE
Assistant United States Attorney

10